AO 440 (Rev. 10/93) Summons in a Civil Action - SDNY WEB 4/99

# United States District Court

SOUTHERN _____ DISTRICT OF _____ NEW YORK

JULIETTE PIERRE,

**SUMMONS IN A CIVIL CASE**

V.

CASE NUMBER:

MOORE CAPITAL MANAGEMENT, LLC. ET AL.

## 08 CV 4209
## JUDGE COTE

TO: (Name and address of defendant)

MOORE CAPITAL MANAGEMENT, LLC.
1251 Avenue Of The Americas
New York, NY , 10020-1104

See also. Addendum (attached)

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

The Law Offices Of Frederick K. Brewington
50 Clinton Street, Suite 501
Hempstead, NY 11550
(516) 489-6959

an answer to the complaint which is herewith served upon you, within _____ 30 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

MAY 0 2 2008

DATE

(BY) DEPUTY CLERK

## ADDENDUM

1.    ANTHONY GALLAGHER
      c/o Moore Capital Management, LLC.
      1251 Avenue Of The Americas
      New York, NY , 10020-1104

2.    JOHN POTTER
      c/o Moore Capital Management, LLC.
      1251 Avenue Of The Americas
      New York, NY , 10020-1104

3.    LYNNE GABRIEL
      c/o Moore Capital Management, LLC.
      1251 Avenue Of The Americas
      New York, NY , 10020-1104

4.    EMPLOYEES JOHN and JANE DOES 1-3
      c/o Moore Capital Management, LLC.
      1251 Avenue Of The Americas
      New York, NY , 10020-1104

08 CV 4209

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
JULIETTE PIERRE,

                  *Plaintiff,*

    -against-

MOORE CAPITAL MANAGEMENT, LLC,
ANTHONY GALLAGHER, in his official and
individual capacities, JOHN POTTER, in his
official and individual, LYNNE GABRIEL in
her official and individual capacities,
EMPLOYEES JOHN and JANE DOES 1-3, in
their official and individual capacities,

                  *Defendants.*
------------------------------------------------------X

Docket No:

**COMPLAINT**

*Jury Trial Is Demanded*



RECEIVED
MAY 0 2 2008
U.S.D.C. S.D.N.Y.
CASHIERS

       Plaintiff, JULIETTE PIERRE, by and through her attorneys, THE LAW OFFICES OF

FREDERICK K. BREWINGTON, provide this Complaint as to the collective Defendants and state

and allege as follows:

## PRELIMINARY STATEMENT

       1.      This is a civil action seeking monetary relief, a declaratory judgment, compensatory

and punitive damages, disbursements, costs and fees for violations of the Plaintiff's rights, brought

pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq</u>, 42 U.S.C § 1981,

and New York State's Human Rights Law - Executive Law § 296 and Breach of Implied Contract.

       2.      Specifically, Plaintiff alleges that the Defendants wantonly, recklessly, negligently,

knowingly and purposefully, acting individually and collectively, sought to and did deprive Plaintiff

of equal employment, and equal employment opportunities through an ongoing and continuous

1

pattern and practice of discrimination, misrepresentation, misinformation, harassment, character assassination, abuse, retaliation, and manipulation of laws, rules and regulations on the basis of Plaintiff's race, color, and age.

3.    Plaintiff alleges that Defendants (collectively and individually) immediately retaliated against her (including but not limited to wrongful termination), in violation of Federal and State law, for engaging in protected activity - that is - for filing a charge of discrimination against Defendants with the New York State Division of Human Rights ("NYSDHR") and the Equal Employment Opportunity Commission ("EEOC") alleging discriminatory practices by Defendants against Plaintiff.

4.    Plaintiff alleges that the individual Defendants conspired and/or failed to prevent a known conspiracy to discriminate and retaliate against Plaintiff solely because of Plaintiff's membership in a protected class and because Plaintiff filed an administrative complaint alleging discrimination and retaliation against Defendants.

5.    Said acts were done knowingly with the consent and condonation of the Defendants, MOORE CAPITAL MANAGEMENT, LLC, ANTHONY GALLAGHER, JOHN POTTER, LYNNE GABRIEL, and EMPLOYEES JOHN and JANE DOES 1-3 with the intended, implied, and expressed purpose of violating the rights of Plaintiff as protected by statutes, rules and regulations. Said activity was known Defendants, but was accepted and supported as policy, practice and custom in violation of Plaintiff's rights and the rights of other African American and older-aged employees of Defendant MOORE CAPITAL MANAGEMENT, LLC.

## JURISDICTION AND VENUE

6.    The jurisdiction of this Court is invoked under 28 U.S.C.  §§ 1331 and 1343.

7.      Plaintiff requests that the Court exercise pendant jurisdiction with respect to Plaintiff's State Law claims, pursuant to 28 U.S.C. § 1367.

8.      Venue in the Southern District of New York is proper under 28 U.S.C. § 1391, based on the fact that the place where the unlawful employment and discriminatory practices complained of herein occurred was at the principal place of business of Defendant MOORE CAPITAL MANAGEMENT, located in New York County.

9.      Prior hereto, Plaintiff, JULIETTE PIERRE, filed a charge with the New York State Division of Human Rights ("NYSDHR") under Case Number 01004768, which was also cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"), under EEOC Charge Number 16G-2005-02543. The initial charge alleged discriminatory actions against Plaintiff by Defendants. The NYSDHR charge was later amended to include a charge of retaliation for Defendants' abusive actions against Plaintiff following her filing of the initial NYSDHR complaint.

10.     On or about February 15, 2007, the NYSDHR determined that there is probable cause to believe the Defendant MOORE CAPITAL MANAGEMENT engaged in discriminatory practices against Plaintiff. (*See* determination after investigation, dated 2/15/07, annexed hereto as *Exhibit A*).

11.     Thereafter, Defendant MOORE CAPITAL MANAGEMENT submitted an application to the NYSDHR seeking reconsideration of its February 15, 2007 determination and requesting that Ms. PIERRE"S NYSDHR complaint be dismissed. By Notice and Final Order, dated December 17, 2007, the NYSDHR denied Defendant's application/request (*See Exhibit B*, Notice and Final Order, dated 12/17/07).

12.     Thereafter, a request was made to the NYSDHR and the EEOC by Counsel for Ms. Pierre with sought an administrative dismissal of the Complaint for administrative convenience as

3

Ms. Pierre intended to pursue her matter in this Federal Court. Plaintiff's request was granted and the EEOC issued a "Dismissal And Notice Of Rights" on or about February 6, 2008, which was received by Plaintiff and Counsel for Plaintiff on February 11, 2008 (*See Exhibit C*, Dismissal And Notice Of Rights, dated 2/6/08, attached hereto).

13.    Plaintiff now timely files the instant Complaint within the 90-day time period prescribed by the EEOC's right-to-sue letter (*Exhibit C*).

## PARTIES

14.    Plaintiff, JULIETTE PIERRE, (hereinafter "MS. PIERRE" and/or "PlAINTIFF") is an African American female, who is currently 52 years of age - being born on February 26, 1956. Plaintiff began working as a (Senior) Data Analyst for Defendant MOORE CAPITAL MANAGEMENT in September 1989. At all times relevant to the Complaint, Ms. PIERRE was an employee of Defendant MOORE CAPITAL MANAGEMENT.

15.    Upon information and belief, Defendant MOORE CAPITAL MANAGEMENT, LLC. (hereinafter "MOORE") is a New York based limited liability company that engages in global investment management and other financial transactions. Upon information and belief, MOORE's principal place of business is located in New York County.

16.    Upon information and belief, Defendant ANTHONY GALLAGHER (hereinafter "MR. GALLAGHER") is a white male and was/is the Director of Operations at Defendant MOORE. Defendant Gallagher and had the ability and authority to make determinations regarding the hiring, firing, and terms and conditions of the employment of the employees within the Trade Support Department at MOORE (including, but not limited to Plaintiff Ms. Pierre). MR. GALLAGHER is being sued herein in his official and individual capacities.

4

17.     Upon information and belief, Defendant JOHN POTTER (hereinafter "MR.
POTTER") is a white male and was and/or is the Operations Supervisor within the Trade Support
Department at MOORE. At all times relevant to the Complaint, Mr. POTTER was Ms. PIERRE'S
immediate supervisor and had the ability and authority to make determinations regarding the hiring,
firing, and terms and conditions of the employment of the employees within the Trade Support
Department at MOORE (including, but not limited to Plaintiff Ms. Pierre). MR. POTTER is being
sued herein in his official and individual capacities.

18.     Upon information and belief, Defendant LYNNE GABRIEL (hereinafter "MS.
GABRIELLE") is a white female and was and/or is the Director of Human Resources at MOORE.
Upon information and belief, MS. GABRIELLE has direct supervisory authority over employees at
MOORE and had the ability and authority (as Director of Human Resources) to make determinations
regarding the hiring, firing, and terms and conditions of the employment of the employees at
MOORE (including, but not limited to Plaintiff Ms. Pierre).  MS. GABRIELLE is being sued herein
in her official and individual capacities.

19.     Upon information and belief, Defendants JOHN and JANE Does 1-3 are all
employees, managers and/or supervisors at Defendant MOORE. Upon information and belief, JOHN
and JANE DOES 1-3 were all involved in decisions the adversely affected the terms and conditions
of MS. PIERRE'S employment - as described below.  The true and accurate names and identities of
JOHN and JANE DOES 1-3 are not known at the time of the filing of the instant Complaint. Plaintiff
reserves the right to amend and include the names of, and specific allegations against, JOHN and
JANE DOE'S 1-3 as same are disclosed and/or becomes known to MS. PIERRE during discovery
in this matter.

5

## FACTUAL ALLEGATIONS

20.     MS. PIERRE  began working as a Data Analyst for Defendant MOORE CAPITAL

MANAGEMENT in September 1989. At that time, MOORE was a relatively new company and had

only a hand full of employees. Presently, MOORE is a large Company with hundreds of employees.

21.     Ms. PIERRE remained steadily employed with MOORE capital management for 16

years following her initial hire (between September 1989 - September 2005).

22.     As an employee of MOORE, MS. PIERRE'S performance has always been

satisfactory and/or above satisfactory as evinced by all of her evaluations wherein she was praised

by Defendant for her accuracy, work, and communication.

23.     Throughout the 16 years that MS. PIERRE remained employed with MOORE, MS.

PIERRE gained more experience and the quality of her work, her technical knowledge/ability, and

her productivity increased. As such, MS.  PIERRE was, and has always been, vastly qualified to

perform her job duties and functions.

24.     MS. PIERRE'S exceptional work performance was praised and noted by Defendants

in MS. PIERRE'S performance evaluations. MS. PIERRE'S performance evaluations were

satisfactory and/or above satisfactory - with the exception of the performance evaluations that were

received by Ms. Pierre immediately following her complaint of discrimination against Defendants

in the Division of Human Rights.

22.     At all times relevant to the instant Complaint, and upon information and belief, MS.

PIERRE was the only African American, and senior-most, Data Analyst in MOORE's Trade Support

department.

23.     At all times relevant to the Complaint, Ms. Pierre was the only African American

Female in Moore Capital Management's New York Office.

24.    Upon information and belief, Moore employed no African American women at any of its other offices/locations at any time relevant to the Complaint.

25.    Upon information and belief, MS. PIERRE was one of the employees with the most seniority, in terms of experience and years employed, at MOORE.

26.    Upon information and belief, MS. PIERRE was the eldest Data Analyst employed at MOORE at the time of her wrongful termination.

### Defendants' Failure/Refusal To Promote, Train, Instruct or Supervise Plaintiff and Defendants' Disparate Treatment Of Plaintiff

27.    Defendant POTTER was hired several years after MS. PIERRE began her employment at MOORE. MR. POTTER became MS. PIERRE's direct supervisor.

28.    When MR. POTTER began in his position, he made derogatory claims against MS. PIERRE, regarding the quality of Ms. PIERRE's work. At that time, MR. POTTER's allegations unsubstantiated and were not supported by MOORE. No action was taken against MS. PIERRE due to MR. POTTER'S comments about MS. PIERRE's work.

29.    During MR. POTTER's time as MS. PIERRE's supervisor, MR. POTTER did whatever he could, however overt or subtle, to keep MS. PIERRE out of the loop of his unit. The reason for POTTER's posture against MS. PIERRE was, because of MS. PIERRE's sex, race, and age.

30.    For example, over the years of MR. POTTER'S management, MR. POTTER hired as many as ten (10) or more people for his unit, all of whom were white males and were all substantially younger in age than MS. PIERRE.

7

31.    Over the years of MS. PIERRE's employ, MS. PIERRE repeatedly expressed her interest in career development, advancement, and training that were being offered at or by MOORE. However, none was forthcoming for MS. PIERRE - as was given to similarly situated younger, white, male employees.

32.    Other, similarly-situated white, younger, male (and some female) employees that were hired after MS. PIERRE have consistently progressed, were given opportunities for advancement and training at the direction and control of Defendants POTTER, GALLAGHER, GABRIELLE, and JOHN/JANE DOES 1-3. Said opportunities were denied to MS. PIERRE.

33.    During the years immediately preceding MS. PIERRE's wrongful termination, the Defendant MOORE, through the concerted and individual actions of its employees, including Defendants POTTER, GALLAGHER, GABRIELLE, and JOHN/JANE DOES 1-3, began forcing the resignations of several of its older-aged and minority employees - some of whom initiated legal actions against MOORE for same.

34.    In September of 2004, MS. PIERRE was approached, MR. POTTER, who scolded, embarrassed, reprimanded and accused her of failing to work a late night shift. MR. POTTER'S unprofessional attacks were carried out in front of MS. PIERRE'S coworkers.

35.    However, MR. POTTER did not know whether MS. PIERRE was, in fact, assigned to work the late night shift. Indeed, MR. POTTER did not accuse and reprimand any of the other non-African American employees at MOORE nor did he review any schedules (if a schedule existed at that time) before reprimanding MS. PIERRE.

36.    When MS. PIERRE denied that she was supposed to work the late-night shift, MR. POTTER could only respond that "someone told him that it was supposed to be [Ms. Pierre's] late

8

night." Following MR. POTTER'S unprofessional reprimand, MS. PIERRE scheduled a meeting

with the Director of Operations, ANTHONY GALLAGHER, and explained how she was verbally

attacked and embarrassed by POTTER without basis.

37.     It was after this event, that MOORE began a formal late-night scheduling process.

38.     Following this incident, wherein MS. PIERRE complained to Defendant

GALLAGHER about the way that she was being unequally and wrongfully treated by MR. POTTER,

Defendants' (particularly MR. POTTER'S) attempts to discredit and force the termination of MS.

PIERRE immediately became blatant and noticeable.

39.     In or about October 2004, Defendant JOHN POTTER (white) told MS. PIERRE that

some of her co-workers and clients had a problem with her personality and how MS. PIERRE

related to them. However, when asked, Mr. Potter refused to provide any information or details by

which any alleged specific complaints about MS. PIERRE could be uncovered and resolved.

40.     MR. POTTER also began introducing additional unsubstantiated rumors that he

"heard" that Ms. Pierre was "unapproachable and hard to work with." Ms. Pierre was never informed

of or given notice of this rumor before it was brought up at a meeting with LYNNE GABRIELLE

in human resources.

41.     Furthermore, Ms. Pierre was never given specific information regarding what made

her "unapproachable."

42.     Defendants did not provide MS. PIERRE with an opportunity to remedy her alleged

"unapproachableness." However, theses unsubstantiated rumors were eventually made part of MS.

PIERRE'S evaluation in 2004 as a basis, in part, for giving MS. PIERRE negative marks on her

evaluation.

9

43.    Upon information and belief, MOORE assists its other (non-African American and younger) employees in remedying their alleged short-comings as the alleged short-comings occur. In MS. PIERRE'S case, Defendants never advised MS. PIERRE of any alleged short-comings in a manner that would allow her to address or correct same. Instead, Defendants created and facilitated a rumor mill to harass and wrongfully accuse MS. PIERRE.

44.    Also during that period, it came to MS. PIERRE'S attention that MOORE might be offering MS. PIERRE'S position to a soon-to-graduate relative of another manager at MOORE. Upon information and belief, this potential replacement was Caucasian, younger than MS. PIERRE, and male.

45.    In November 2004, MS. PIERRE'S performance evaluation was due (as they were always given in or around this time every year prior). However, no evaluation was forthcoming or provided to MS. PIERRE until February 9th of the following year, 2005.

46.    On that date, MS. PIERRE met with MR. POTTER who told MS. PIERRE that she was "doing very well" and handed MS. PIERRE a satisfactory performance evaluation to sign. As soon as MS. PIERRE signed it, MR. POTTER immediately got up and left before MS. PIERRE had an opportunity to ask for a copy.

47.    Based upon MS. PIERRE's 16 years of experience at MOORE, it has always been the previous practice at MOORE to supply the employee with a copy of the evaluation after the evaluation is discussed - for the employees records and also in the event that the employee wishes to submit comments to the evaluation.

48.    After several attempts to get a copy of this evaluation, one week later, MS. PIERRE finally received something that was purported by MR. POTTER to be a copy of the evaluation that

10

MS. PIERRE signed.

49.    However, upon reading this alleged evaluation, MS. PIERRE discovered that the first two (unsigned) pages of the evaluation were changed or altered. This new evaluation  conferred a less than satisfactory review upon MS. PIERRE and was not the evaluation that MS. PIERRE previously saw, reviewed and signed.

50.    MS. PIERRE  requested meetings with Defendants POTTER and GABRIELLE to discuss the alleged evaluation and the changes that were made thereto. Defendants delayed in giving MS. PIERRE a meeting. However, a meeting finally took place on February 17th, 2005.

51.    On February 17, 2005, MS. PIERRE  met with MR. POTTER, ANTHONY GALLAGHER, Kevin Shannon (Chief Financial Officer) and Defendant LYNN GABRIEL.

52.    During this meeting, MR. POTTER denied that he switched of reviews. Upon information and belief, no further action was taken by Defendants to investigate and/or verify whether MR. POTTER actually switched the evaluations as Ms. PIERRE asserted.

53.    Upon information and belief, no further action was taken by Defendants to investigate and/or verify whether Ms. PIERRE was the source of the .

54.    Instead, MS. PIERRE - for the first time in 15+ years of employment at MOORE - was regarded as being untruthful about her allegation that MR. POTTER altered her evaluation. At all times thereafter, MS. PIERRE maintained that the evaluation was switched and that she was, indeed, being truthful.

55.    Upon information and belief, no similarly-situated non-African American employees under the supervision of Defendant POTTER had their evaluations switched such as MS. PIERRE.

56.    Prior to MS. PIERRE's receipt of this 2004 performance evaluation, MS. PIERRE

11

had never been informed of any deficiencies in her work, or errors, or complaints made by clients and co-workers about her performance. Indeed, the alleged errors attributed to MS. PIERRE for the first time in this performance evaluation could have been committed by a number of people in the Trade Support Department in New York or in MOORE'S London office.

57.    Nevertheless, upon information and belief, no similarly-situated , younger, male, or non African American employees in the Trade Support Department were accused of errors and other work-related deficiencies that were summarily attributed to MS. PIERRE in this 2004 evaluation.

58.    MR. POTTER's above-cited actions against MS. PIERRE were taken by MR. POTTER against MS. PIERRE because of her race, color, and age.  No similarly-situated non African American, male, and/or younger employees at Moore (particularly those employees that also could have been responsible for trade support errors) were accused of errors or given poor evaluations.

59.    Upon information and belief, Defendants POTTER and GALLAGHER routinely inform other similarly-situated employees of errors our deficiencies in their work product (if any) and provide said employees with an opportunity to address and rectify any such issues before evaluations.

60.    MS. PIERRE was never informed of any deficiencies in her work or problems that she (allegedly) had with co-workers at any time prior to giving MS. PIERRE a poor evaluation.

61.    MS. PIERRE complained to Defendants POTTER, GALLAGHER, Kevin Shannon (Chief Financial Officer) and Defendant LYNN GABRIEL that MR. POTTER's actions - in wrongfully blaming MS. PIERRE for errors, switching her performance evaluation, accusing Ms. PIERRE of having problems with her co-workers without proof or substantiation of any kind, among

other things - of being discriminatory because no other employees were subjected to the same or similar treatment.

62.     MS. PIERRE'S concerns and complaints were ignored by the collective DEFENDANTS.

63.     Based upon the above actions of the collective Defendants, and the fact that MS. PIERRE felt that she had no recourse regarding her complaints within MOORE (despite MOORE's anti-discrimination/harassment policies which provides for employees to voice concerns and to receive a fair review of said concerns) MS. PIERRE was forced to file a complaint with the NYSDHR on or about March 28, 2005 alleging discrimination based upon age, sex, and color.

64.     As part of Ms. PIERRE'S NYSDHR complaint, MS. PIERRE also predicted and alleged that Defendants were planning and setting her up for termination and/or to be replaced by a younger, Caucasian, male individual.

### Defendants' Retaliation Against Ms. Pierre For Filing A Discrimination Complaint and For Engaging In Other Protected Activity

65.     Immediately after MS. PIERRE filed a complaint of discrimination with the Division of Human Rights, Defendants immediately began a campaign of harassment, abuse, false accusations, character assassination, and other harmful treatment against MS. PIERRE.

66.     The collective Defendants' immediate harmful actions against MS. PIERRE was in direct retaliation because MS. PIERRE filed a discrimination complaint with the NYSDHR.

67.     On or about April 26, 2005 - approximately on month after Ms. Pierre filed her NYSDHR complaint, Defendants responded to MS. PIERRE's NYSDHR complaint. In their response, Defendants asserted, among other things, that they had no intention or plans to terminate

13

Ms. Pierre.

68.    However, Defendants' collective actions against MS. PIERRE following her NYSDHR complaint demonstrated that Defendants were, indeed, creating circumstances in furtherance of a concerted effort to wrongfully terminate MS. PIERRE. No such plan of efforts by Defendants existed prior to MS. PIERRE's NYSDHR complaint.

65.    Subsequent to Ms. Pierre's complaint to the Division, MOORE ***suddenly*** began sending MS. PIERRE numerous memos and correspondences accusing MS. PIERRE of alleged deficiencies in her work.

66.    The aforementioned memos and emails, which were never sent to MS. PIERRE before she filed her NYSDHR complaint, became frequent after she filed her complaint.

67.    Indeed, the accusations concerning MS. PIERRE'S alleged deficiencies changed insofar as they became more detailed and more accusatory. However, the fact that the accusations were all unreasonable, blindly asserted and unsubstantiated remained consistent.

68.    MS. PIERRE wrote responses to these unreasonable and retaliatory memos/emails in an attempt to address the issues raised by MR. POTTER and perhaps resolve them. However, MR. POTTER never replied to MS. PIERRE'S responses or concerns.

69.    In fact, MR. POTTER (who was Ms. Pierre's direct supervisor)began avoiding direct communication with MS. PIERRE and even refused to acknowledge MS. PIERRE'S correspondences.

70.    MR. POTTER refused to communicate with MS. PIERRE face-to-face, at all.

71.    Ms. Pierre wrote numerous memos and correspondences to MR. POTTER and raised issue with the fact that MR. POTTER avoided direct communications and totally ignored MS.

14

PIERRE'S concerns.

72.    Among other things, MS. PIERRE explained that MR. POTTER'S "recent lack of direct communication with [Ms. Pierre] when [Mr. Potter had] a question or issue regarding [her] performance created a very difficult environment. . ."

73.    MS. PIERRE also complained that MR. POTTER refused to acknowledge any of her attempts to communicate with him regarding performance issues. Additionally, MS. PIERRE raised issue with the fact that MR. POTTER ignored all of her attempts to prove (through documentation and other methods) that MS. PIERRE was not the source of the errors of which MR. POTTER accused MS. PIERRE.

74.    However, even these complaints by MS. PIERRE, that her direct supervisor MR. POTTER was unresponsive and refused to allow MS. PIERRE to demonstrate that his accusations against her were unfounded, were ignored by MR. POTTER **and** other supervisors/managers at MOORE - including Defendants GALLAGHER, GABRIELLE and EMPLOYEES JOHN and JANE DOES 1-3 .

75.    It was clear that MOORE had no interest in addressing and/or rectifying any of MS. PIERRE'S concerns. What became equally clear was that Defendants had no interest in remedying any alleged performance deficiencies that Defendant claimed MS. PIERRE exhibited.

76.    Instead, Defendants MOORE, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 (with full knowledge and notice of MR. POTTER'S activities) continued to allow MR. POTTER to engage in his unprofessional, harassing, and tormenting daily behavior toward MS. PIERRE, which was clearly intended to set up MS. PIERRE for termination.

77.    Once MS. PIERRE filed her NYSDHR complaint, the correspondences from

Defendant POTTER, with approval from MOORE, regarding Ms. Pierre's alleged shortcomings began, continued, and increased significantly.

78.    Once MS. PIERRE filed her NYSDHR complaint, MS. PIERRE was subject to increased, daily, overt scrutiny by MOORE, POTTER, GABRIELLE, GALLAGHER, and EMPLOYEES JOHN and JANE DOES 1-3.

79.    Once MS. PIERRE filed her NYSDHR complaint, Defendants began communicating and consulting with outside attorneys regarding MS. PIERRE with respect to everything that MS. PIERRE did at MOORE.

80.    In fact, once MS. PIERRE filed her NYSDHR complaint, Defendants (particularly Defendants GABRIELLE and POTTER) began sending all of their accusatory and unreasonable emails and memos to outside counsel for corrections and approval **_before_** sending these correspondences to MS. PIERRE.

81.    With the exception of MS. PIERRE, Defendants **_did not_** communicate with outside counsel with respect to internal work-related matters regarding any other similarly and/or non-similarly situated employees at MOORE.

82.    Defendants' were creating a paper-trial of incidents involving MS. PIERRE in preparation and in furtherance of their plan to wrongfully terminate MS. PIERRE for filing a complaint with the NYSDHR.

83.    Further, once MS. PIERRE filed her NYSDHR complaint, Ms. Pierre was marginalized from her work group and made to sit at a location away from her group. Though Defendants caused MS. PIERRE to be separated from her work-group, at the same time, Defendants accused MS. PIERRE of failing and/or refusing to communicate with her work group.

16

84.    Once MS. PIERRE filed her NYSDHR complaint, MR. POTTER, stopped directly communicating with MS. PIERRE and would communicate with MS. PIERRE by email only to accuse her of poor performance.

85.    Once MS. PIERRE filed her NYSDHR complaint, MR. POTTER began sabotaging MS. PIERRE'S work and blaming MS. PIERRE for errors that he caused and/or knew about and could have rectified.

86.    MR. POTTER and GALLAGHER and GABRIELLE refused to address (and ignored) all of MS. PIERRE'S concerns regarding their allegations of her poor performance. Essentially, Defendants intended to make sure that the alleged performance issues (if any) went unremedied so that they could justify terminating MS. PIERRE.

87.    Defendants refused to allow Ms. Pierre to prove that she was not the source of any errors;

88.    On several occasions, MS. PIERRE advised Defendants that their concerted and individual actions against her was creating a hostile work environment. Indeed, Defendants' actions against MS. PIERRE occurred with such intensity and frequency, after MS. PIERRE filed her NYSDHR complaint, that her work environment became very hostile and unbearable.

89.    In June 2005, two months following MS. PIERRE's complaint to the NYSDHR, Defendants MOORE, POTTER, GALLAGHER, and GABRIELLE, with approval and guidance of outside counsel and EMPLOYEES JOHN and JANE DOES 1-3, sent MS. PIERRE a memo wherein Defendants purported to provide MS. PIERRE with a laundry list of MS. PIERRE'S alleged deficiencies.

90.    Defendants allegedly provided said memo in order to "follow up on the conversations

that [they] had with [Ms. Pierre] on several occasions over the course of the past year."

91.    However, interestingly and most revealing, Defendants' memo *only* listed alleged incidents and/or alleged mistakes made by MS. PIERRE beginning from ***April 2005 through June 2005*** (*recall that Ms. Pierre filed her Complaint with the NYSDHR on March 28, 2005*).

92.    Although Defendants provided the memo as a "follow up," many of the alleged mistakes were brought to MS. PIERRE'S attention for the first time in this memo. Furthermore, once again, Defendants blindly placed the blame for mistakes on MS. PIERRE without even a minimal investigation.

93.    Upon information and belief, not only did Defendant not provide this type of memo to any of the other employees at MOORE who perform the same and/or similar functions as MS. PIERRE (i.e. enters/inputs trades), but Defendant did not provide this type of memo to **any** of its other employees.

94.    Though Defendants claimed (in the NYSDHR) that MS. PIERRE's deficiencies began in 2003 or earlier, MS. PIERRE was never given such a memo prior to her filing of the NYSDHR complaint.

95.    None of the employees at the equities or income desks (who were also responsible for verifying and entering inputs) were accused, reprimanded, investigated, and/or given such a threatening memo as was MS. PIERRE.

96.    MS. PIERRE responded to MR. POTTER'S unreasonably accusatory memo. In MS. PIERRE'S memo, MS. PIERRE outlined all of the procedures that she underwent on a daily basis in order to confirm the accuracy of her work - especially in light of the fact that she was now constantly being accused of being deficient.

97.    Due to Defendant's actions, MS. PIERRE was forced to go above and beyond the normal protocol in order to ensure that her work was accurate. No other similarly situated employees were forced to undergo such stringent procedures regarding their work.

98.    In addition to confirming some of her inputs with Defendant GALLAGHER to ensure accuracy, Ms. Pierre also confirmed her inputs with other employees at both the fixed income and equities desks, as well as the Risk Manager Jeffery Halpern, who also confirmed Ms. Pierre's inputs.

99.    However, Defendant nevertheless continued to wrongfully fault Ms. Pierre alone. Indeed, even though MS. PIERRE verified her work with Defendant GALLAGHER and her co-workers, when MS. PIERRE was being wrongfully accused of errors, Defendant GALLAGHER stood by and did nothing when he was aware the MS. PIERRE was being wrongfully accused.

100.    Defendant GALLAGHER could have prevented and/or stopped the harassment being leveled upon MS. PIERRE, but he intentionally chose to stand by and allow the hostile work environment, false accusations, discrimination and retaliation to continue and escalate against MS. PIERRE.

101.    In addition, Mr. Potter has took it upon himself to arbitrarily alter long-standing practices and procedures, without informing Ms. Pierre in order to make sure that MS. PIERRE did not adhere to the newly-implemented procedures and to insure that MS. PIERRE would be cited and faulted for failing to comply.

102.    Defendants did in fact cite to MS. PIERRE's failure to me informed and failure to follow newly-implemented rules and procedures.

103.    Despite MS. PIERRE's notice to Defendants that she was not being informed of the

new procedures (if any), and despite MS. PIERRE's constant requests for information, training, re-training, and advice on new practices, Defendants intentionally kept MS. PIERRE uniformed and marginalized MS. PIERRE from her work group to ensure that her communications with them (regarding new procedures [if any]) would be hindered.

104.    At the time that MR. POTTER was accusing MS. PIERRE of errors, MS. PIERRE noticed that traders stopped calling MS. PIERRE with information. Instead, traders were contacting MR. POTTER and other co-workers that were not supposed to handle these matters.

105.    When Ms. Pierre contacted these traders to find out why they stopped calling her, she was advised "we are just doing what we were told to do by your manager [Mr. Potter]."

106.    It is important to MS. PIERRE'S job to remain in contact with these individuals in order to have accurate and up-to-date information regarding trades. When POTTER told these people not to contact MS. PIERRE, it made MS. PIERRE'S duties difficult/impossible.

107.    In September 2005 - 5½ months after Ms. Pierre filed her NYDSHR complaint and afer 16 years of employment at MOORE, Ms. Pierre was summarily, unfairly, and wrongfully terminated.

108.    Defendants cited to MS. PIERRE's alleged deficiencies  without giving her any opportunity to address her alleged deficiencies and without an opportunity to address the false allegations of MR. POTTER.

109.    Instead, though MOORE fired MS. PIERRE for alleged misconduct, MOORE still offered Ms. Pierre (who was a sixteen-year veteran employee of Moore) a nominal severance payment and a small offer of settlement in exchange for her promise to sweep any further discrimination complaints under the rug.

110.    Although Moore assured the NYSDHR prior that "it had no plans to terminate or replace Ms. Pierre" MOORE, through the concerted and premeditated actions of Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 fired MS. PIERRE *less than six months* following her discrimination complaint to the Division.

111.    At all times prior to MS. PIERRE's termination, the collective Defendants subjected MS. PIERRE to and ongoing and continuous pattern of harassment, abuse, subjugation, ridicule, scrutiny, and retaliation and created an oppressive hostile work environment for MS. PIERRE.

113.    Defendants' above-state practices against MS. PIERRE is consistent with the poor diversity employment practices of MOORE, which promotes and advances its non-diverse work environment, including but not limited to refusing to hire African American and older workers and/or cleansing its workforce of existing African American and older employees through discrimination and retaliation.

113.    As a result of the collective Defendant discriminatory and retaliatory treatment of Ms. PIERRE, MS. PIERRE was caused to suffer injuries and damages including, but not limited to, loss of employment, loss of standing and reputation in the financial community in which she worked, loss of pay, loss of benefits, loss of job security (which she maintained for 16 years prior), blacklisting by Defendants (upon information and belief), stress, humiliation, depression, emotional injuries, anger, loss of sleep, special damages, attorney's fees/costs, financial hardship, loss of future employment opportunities, etc.

## AS AND FOR A FIRST COUNT
### Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e
(as to Defendant MOORE)

114.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 114

21

inclusive of this complaint, with the same force and effect as though herein fully set forth herein.

115.    The Defendant, MOORE, its employees, representatives and associates (including Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3) discriminated against the Plaintiff in her employment based on Plaintiff's race and color and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended.

116.    The Defendant, MOORE, its employees, representatives and associates (including Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3) retaliated against Plaintiff and created a hostile work environment towards Plaintiff and other minority employees for engaging in protected activity.

117.    As a direct result of said acts, Plaintiff suffered and continues to suffer distress, humiliation, embarrassment, financial expense, loss of employment, loss of employment opportunities, and damage to her reputation.

118.    The Defendant, MOORE, its employees, representatives and associates (including Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3) violated public policy in discriminating against Plaintiff because of her race, color and age. Defendant MOORE was aware of the discriminated and retaliation being hoisted upon MS. PIERRE. Nevertheless, Defendant failed to correct/prevent this ongoing violation.

119.    As a result of Defendant, MOORE'S, its employees, representatives and associates (including Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3) acts, Plaintiff is entitled to the maximum monetary damages and penalties available by law, as well as costs and attorneys fees from, Defendant MOORE, under Title VII.

22

## AS AND FOR A SECOND COUNT
### New York State Executive Law § 296 (Human Rights Law)
(Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and
JANE DOES 1-3)

120.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 119

inclusive of this complaint, with the same force and effect as though fully set forth herein.

121.    Defendant, MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES

JOHN and JANE DOES 1-3 wrongfully discriminated against Plaintiff - by refusing to promote

Plaintiff, and retaliating against Plaintiff by creating a hostile work environment - on the basis of her

race, age, sex and color.

122.    Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES

JOHN and JANE DOES 1-3 wrongfully altered the terms, conditions, privileges, and compensation

of Plaintiff's employment, and unlawfully altered and damaged his employment relationships in

violation of New York's Executive Law § 296.

123.    The collective Defendants knew in advance of the occurrence, of the discriminatory

actions being taken against the Plaintiff but negligently, recklessly and intentionally failed to prevent

such acts and/or joined in a conspiracy to further said acts.

124.    Upon information and belief, the collective Defendants were each aware that illegal

and discriminatory actions were and would be taken against the Plaintiff, but took no action to

prevent such conduct. Instead they added to and furthered said discriminatory conduct and thereby

condoned such adverse acts taken against the Plaintiff.

125.    Individual Defendants POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES

JOHN and JANE DOES 1-3 aided and abetted Defendant MOORE in its discriminatory and

23

retaliatory practices against MS. PIERRE. As such, Individual Defendants MOORE, POTTER,

GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 are liable as aiders

and abetters to the overall discriminatory environment to which MS. PIERRE was subjected.

126.    Defendants violated public policy in discriminating/retaliating against Plaintiff

because of her race, age, and color.

127.    As a result of Defendants acts, Plaintiff suffered and is entitled to a sum in excess of

$3,000,000 in compensatory damages, pain/suffering, and other damages.

**AS AND FOR A THIRD COUNT**
**42. U.S.C § 1981**
(Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and
JANE DOES 1-3 )

128.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1through127

inclusive of this complaint, with the same force and effect as though herein fully set forth.

129.    The above described discriminatory pattern and practice based on race and color by

Defendants  MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and

JANE DOES 1-3 violate 42 U.S.C. §1981 as amended by the Civil Rights Restoration Act of 1991

(Publ. Law No. 102-406).

130.    As a direct and proximate result of Defendants' MOORE, POTTER, GALLAGHER,

GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3's acts, Plaintiff suffered and continue

to suffer emotional distress, humiliation, great expense, embarrassment, special damages,

fees/costs/expenses, and monetary losses.

131.    Because of Plaintiff's color, age, sex and race, Defendants MOORE, POTTER,

GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 subjected Plaintiff

24

to abuse and mistreatment as detailed above and has been treated differently than similarly situated non African American, younger, male coworkers.

132.    Defendants violated public policy in refusing to promote Plaintiff and Retaliating against Plaintiff because of her race, color sex, and age.

133.    As a result of Defendants' acts, Plaintiff suffered, and is entitled to damages sustained to date and continuing in excess of $3,000,000.00 as well as punitive damages, costs and attorney's fees (*pursuant to 42 USC § 1988*).

**AND AS FOR A FOURTH COUNT:**
**BREACH OF IMPLIED CONTRACT**
(Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3)

134.    The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 133 of this complaint with the same force and effect as though fully set forth herein.

135.    The above discriminatory and retaliatory actions, pattern and practices based on race and color by defendants individual Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3, their agents and employees violates Plaintiff's civil rights.

136.    Each Defendant MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 knew or should have known that their actions constituted a discriminatory/retaliatory practice based on plaintiff's race and color.

137.    In conspiring to prevent Plaintiff from advancement and plotting Plaintiff's wrongful termination (as described above), each defendant MOORE, POTTER, GALLAGHER, GABRIELLE,

and EMPLOYEES JOHN and JANE DOES 1-3 knew and agreed either openly and tacitly that they would take affirmative steps to discriminate against plaintiff based on his race and color.

138.    Each Defendant MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 personally and collectively conspired, after MS. PIERRE filed her discrimination complaint, to further deny MS. PIERRE further promotions and advancement opportunities and to assure that MS. PIERRE would be terminated without actual basis or business justification.

139.    Each Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 personally and collectively conspired to negatively affect the terms and conditions of MS. PIERRE'S employment by arbitrarily and maliciously agreeing to give Plaintiff negative performance evaluations, memos, increased scrutiny, and by creating a hostile work environment and terminating Plaintiff after she filed her complaint with the NYSDHR.

140.    Upon information and belief, Defendant MOORE has an Equal Employment Opportunity statement, forbidding discrimination in the workplace. Further, MOORE's stated policies, practices, procedures promises employees the right to make complaint about discrimination and harassment without fear of retaliation.

141.    Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 each individually and collectively conspired to disregard and violate MOORE'S Equal Employment Opportunity statement by discriminating and retaliating against Plaintiff as described above. By violation MOORE'S anti-discrimination policy, each Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 were acting outside of the scope of their employments and pursuant to their own personal motives.

142.    Defendants, each individually and collectively, had a duty as promised to MOORE as well as to their coworkers to refrain from discriminatory practices and, at the very least, to refrain from retaliating against employees (such as Plaintiff) for raising concerns of discrimination.

143.    Defendants, each individually and collectively, saw the anti-discrimination policy and each agreed, verbally and in writing, to abide by same.

144.    Defendants breached their duties by subjecting MS. PIERRE to discriminatory practices and by openly retaliating against MS. PIERRE for opposing discriminatory practices against her in the workplace.

145.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of employment opportunity, proper terms and conditions of employment, loss income, injury to career, loss of other employment and retirement benefits and have suffered and continue to suffer distress, humiliation, physical injury, loss of benefits, special damages, attorney's fee's/costs/expenses, embarrassment and damage to her reputation.

146.    As a result of Defendants' acts plaintiff suffered and is entitled to damages sustained to date and continuing in the amount of $3,000,000.00.

### AS AND FOR A FIFTH COUNT
### Age Discrimination in Employment Act of 1967
(Defendant MOORE)

147.    The plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 of this complaint with the same force and effect as though fully set forth herein.

148.    Defendant MOORE has hundreds of employees and two branches and/or places of business.

27

149.    Defendant MOORE violated the Age Discrimination in Employment Act by, *inter alia,* discharging and/or otherwise discriminating against MS. PIERRE with respect to her compensation, terms, conditions, or privileges of employment, in part, because of her age;

150.    Defendant MOORE violated the Age Discrimination in Employment Act by, *inter alia,* limiting, segregating, and classifying MS. PIERRE in any way which deprived or tended to deprive her of employment opportunities and otherwise adversely affect her status as an employee, because of her age - as described in ¶¶1-150 above).

151.    Defendants MOORE and its employees, associates, representatives and agents, such as Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 were all aware of and/or involved in the conspiracy to Retaliate against MS. PIERRE because of her age, among other factors.

152.    None of the Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 took actions to prevent, divulge or reverse the wrongful plan and actions being taken against Plaintiff to discriminate, humiliate, and harass, and to unlawfully alter and damage her employment.

153.    Defendants, and each one of the individually named defendants acquiesced and contributed to the conspiracy to violate Plaintiff's rights; by orchestrating, contributing to and engaging in a conspiracy to have Plaintiff harmed in retaliation for filing a discrimination complaint with the NYSDHR - because of her age.

154.    Each of the Defendants MOORE, POTTER, GALLAGHER, GABRIELLE, and EMPLOYEES JOHN and JANE DOES 1-3 condoned the wrongful, discriminatory, reckless, careless and intentional acts taken as set out herein and each had an affirmative responsibility to

28

prevent expose and reverse said wrongful discriminatory reckless, careless and intentional acts but instead joined, condoned, or failed to prevent this conspiracy against plaintiff because of her age.

155.    As a direct result of said acts, Plaintiff has suffered and continues to suffer loss of employment opportunity, proper terms and conditions of employment, loss income, injury to career, loss of other employment and retirement benefits and have suffered and continue to suffer distress, humiliation, physical injury, embarrassment and damage to his reputation.

156.    As a result of Defendants' acts plaintiff suffered and is entitled to damages sustained to date and continuing in the amount of $3,000,000.00.

## PUNITIVE DAMAGES

157.    That Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 157 of this Complaint with the same force and effect as though fully set forth herein.

158.    The acts of the collective Defendants were willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Plaintiff, without regard for Plaintiff's well being, and were based on a lack of concern and ill-will towards Plaintiff.  Such acts therefore deserve an award of Five Million Dollars ($5,000,000.00) as punitive damages.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

a.    First Count: for a sum equal to the maximum amount of damages permitted by law;

b.    Second Count: in excess of $3,000,000, in compensatory damages, and a sum for punitive damages; pain and suffering;

c.    Third Count: in excess of $3,000,000, in compensatory damages; pain and suffering;

29

d.    Fourth Count: in excess of $3,000,000, in compensatory damages; pain and suffering;

e.    Fifth Count: in excess of $3,000,000, in compensatory damages; pain and suffering;

f.    Punitive damages: in the amount of $5,000,000;

g.    Attorney's fees and costs, pursuant to 42 U.S.C. § 2000e-5(k);

h.    A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

I.    An order granting such other legal and equitable relief as the court deems just and proper.

### *PLAINTIFF DEMANDS A TRIAL BY JURY*

dated:  Hempstead, New York
        April 30, 2008

                                            LAW OFFICES OF
                                            FREDERICK K. BREWINGTON

                            By:  _____
                                            GREGORY CALLISTE, JR (GC-8140)
                                            *Attorneys for Plaintiff*
                                            50 Clinton Street, Suite 501
                                            Hempstead, New York  11550
                                            (516) 489-6959

30

EXHIBIT A

LAW OFFICES OF
FREDERICK K. BREWINGTON

FEB 2 0 2007

RECEIVED

STATE OF NEW YORK
DIVISION OF HUMAN RIGHTS

---

STATE DIVISION OF HUMAN RIGHTS
on the Complaint of

JULIETTE PIERRE,

Complainant,

v.

MOORE CAPITAL MANAGEMENT, LLC,

Respondent.

---

DETERMINATION AFTER
INVESTIGATION

Case No.
10104768

Federal Charge No. 16GA502543

On 3/28/2005, Juliette Pierre filed a verified complaint with the State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of race/color, sex, age, opposed discrimination/retaliation in violation of the Human Rights Law of the State of New York.

After investigation, the Division has determined that it has jurisdiction in this matter and that there is <u>PROBABLE CAUSE</u> to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

Pursuant to the Human Rights Law, this matter is recommended for public hearing. Parties will be advised of further proceedings.

Dated: February 15, 2007
New York, New York

STATE DIVISION OF HUMAN RIGHTS

By: _____
Wilson P. Ortiz
Acting Regional Director

# STATE OF NEW YORK
## EXECUTIVE DEPARTMENT
## DIVISION OF HUMAN RIGHTS

---

## INTER-OFFICE MEMORANDUM

TO:    Files

REGION: Upper Manhattan

FROM: Wilson Ortiz
      Acting Regional Director

DATE: January 10, 2007

SDHR CASE NO: 10104768-05-E-ARSO-E

Federal Charge No. 16GA502543

SUBJECT:  Juliette Pierre v. Moore Capital Management,LLC

### FINAL INVESTIGATION REPORT AND BASIS OF DETERMINATION

### I.    CASE SUMMARY

This is a verified complaint, filed by complainant, Juliette
Pierre, on 3/28/2005.  The complainant, who is a 49 year old
(d.o.b. 2/26/56) Black female and who opposed a discriminatory
practoce, charges the respondent with unlawful discriminatory
practices in relation to employment because of race/color, sex,
age, opposed discrimination/ retaliation.

### II.   SUMMARY OF INVESTIGATION

Complainant's Position:

The complainant began working for the respondent in September
1989 as a Data Analyst.  The complainant always received
satisfactory performance evaluations, except for her last
evaluation.

In October 2004, the complainant's immediate supervisor, John
Potter (Caucasian), Operations Manager, told her that some of
her co-workers and clients had a problem with her personality
and how she treated them.  The complainant stated that Mr.
Potter refused to give any specific information about said
complaints.  During the same period, the complainant learned

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management, Llc

that the respondent might be offering her position to a soon-to-
graduate relative of a colleague.

In November 2004, the complainant's performance evaluation was
due.  The complainant did not receive this evaluation until
February 9, 2005.  On that date, the complainant met with Mr.
Potter who told her that she was doing very well and handed her
a satisfactory performance evaluation to sign.  As soon as the
complainant signed the evaluation, Mr. Potter got up and left
before the complainant had a chance to ask for a copy.

The complainant made several attempts to get a copy of this
evaluation.  About one week later, the complainant received a
copy of the evaluation only to learn that the first two unsigned
pages were changed and displayed a less than satisfactory
review.

On February 17, 2005, the complainant met with Mr. Potter;
Anthony Gallagher, Director of Operations; Kevin Shannon, Chief
Financial Officer; and Lynn Gabriel, Director of Human
Resources.  Mr. Potter denied switching the reviews.  The
complainant stated that she has yet to receive the original
review that she signed, nor has the respondent validated the
review which Mr. Porter purports is his original.

The complainant believes that she is being treated disparately
due to her age, sex and race/color because Mr. Potter made
similar complaints against her in the past; that Mr. Potter has
kept the complainant "out of the loop" in his unit since he
became her manager; that Mr. Potter has hired as many as 10
Caucasian males in the unit over the years; that the
complainant's requests for career development and advancement
have been unanswered while others hired after her have
progressed; and that older and Black employees have been forced
to resign from the company over the last six months.

After the complainant filed this complaint, Mr. Potter began
sending her various memos and correspondences accusing the
complainant of alleged deficiencies in her work.  The
complainant wrote responses to these unreasonable and
retaliatory memos/emails; however, Mr. Potter only replied once.
In said responses, Mr. Potter only threatened termination and
was unresponsive to her concerns.  It was clear that the
respondent had no interest in addressing and/or rectifying any
of her concerns, nor did the respondent have an interest in
remedying any alleged performance deficiencies it claimed she
exhibited.

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

After the complainant filed her complaint, the respondent's correspondence regarding her alleged shortcomings began; the communications continued and increased; she was marginalized from her work group and made to sit at a location away from her work group; Mr. Potter stopped directly communicating with her; Mr. Potter began sabotaging her work and blaming her for errors; Mr. Potter refused to address all of her concerns regarding respondent's allegations of poor performance; the respondent refused to allow her to prove that she was not the source of any errors; and, on September 8, 2005, the complainant was summarily terminated without any opportunity to address her alleged deficiencies or to address false allegations made against her.

The complainant submitted written rebuttal comments to the respondent's statement of position.  The complainant's rebuttal comments are summarized below.

Concerning the claim that complainant felt it was inconvenient for her to work the late night schedule the respondent implemented, she said that the respondent's assertions are factually inaccurate.  The complainant explained that the company had not formal way of assigning late night duty when such a schedule was originally being implemented. The complainant noted that Mr. Potter scolded her in front of her co-workers about this issue; something he did not do to any of her peers.  The complainant stated that she initially was not able to stay late for an entire week one full week every six weeks.  The complainant rearranged her after work responsibilities, and later committed to the weekly schedule. The complainant noted that his fact was omitted by the respondent in its position statement.

The respondent claimed that the complainant frequently declared herself unable to stay late on her single night coverage causing other employees to cover her without advance notice.  The complainant pointed out that these alleged acts were never raised by the respondent in their evaluations of her performance.  Furthermore, these alleged acts were never brought to the complainant's attention before she filed her complaint against the company.

The complainant made the following rebuttal comments in response to the respondent's claim of alleged inaccuracies in her work.

The respondent stated that options for orange juice had been misbooked three times in a period of one week.  The respondent blamed the complainant for the misbooking and sent the complainant an email to that effect.  The complainant argued

3

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

that she was not the only person who could have misbooked these
options; however, she was singled out as the responsible person.
The complainant feels that the respondent had a "blame Ms.
Pierre first, investigate later" attitude about her.  The
complainant asserted that other non African American and younger
staff members, who also handled the orange juice options that
week, were not treated in this manner.  The complainant further
asserted that the respondent never blindly blame those persons
for errors or missbookings before verifying the same.

The complainant added that she later reviewed every orange juice
trade that she entered in the days in question with the
Operations Director, and her entries were accurate. The
complainant noted that the Risk Management Department informed
her that a problem existed in the company's investment master
system which contributed to booking errors in certain types of
commodities, such as orange juice.  The complainant asserted
that the respondent had been aware of this problem for three
months at the time she was accused of the misbookings.

The respondent claimed that during 2004, it received complaints
both internally and from clients indicating that the
complainant's work was inaccurate and the she was unresponsive
in correcting errors.  The complainant refuted this claim by
stating that the email communications on which respondent based
this claim do not implicate the complainant as the source of the
error; that the complainant is not the only person that could be
responsible for misbooked trades; and that others received the
same emails, not just the complainant.

The complainant added that at the time these emails were sent,
the complainant was not blamed for the errors.  It was only
after she filed the instant complaint that the complainant was
blamed for them.

The respondent claimed that the complainant's performance
deteriorated in 2004 as reflected in her performance evaluation
for that year.  The complainant stated that her 2004 evaluation
was "switched and altered" without her knowledge.  The
complainant said that when she went to the Operations Manager's
office to review her evaluation, she noticed that it was
consistent with the good evaluations she received in prior
years. The complainant stated that the only negative mark which
fell below expectations was in the category marked
"professionalism."  The complainant said she was told this mark
was attributed to the fact that she needed to mingle more with
clients and that she does not take part with members of the
company when they go out for dinner after work.  The complainant

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

admits that she often declined to go out for dinner and drinks
after work due to important commitments she must attend to after
work.  The complainant said that she signed and dated the
evaluation, but she never received a copy of it that day.

The complainant said that she requested a copy of her evaluation
several times thereafter.  The complainant realized that the
evaluation had been altered after she finally got a copy of it.
The copy the complainant received was unsigned and undated.  The
complainant pointed out that the respondent admitted she signed
the evaluation.

The complainant pointed out that she did not challenge the
original evaluation that she signed and dated. However, the
complainant did challenge the altered, unsigned and undated
evaluation in writing.  The complainant said that she challenged
the evaluation in a meeting with the Operations Manager, the
Operations Director and others.

The complainant pointed out that none of her peers received poor
evaluations, had their evaluations altered, were blamed for any
misbookings, or were marked negatively for failing to got to
after work social gatherings.  The complainant asserted that
after work gatherings are not a mandatory part of her job
duties; however, she was given a negative mark for failing to
make such gatherings due to after work commitments.

The complainant noted that she received a "below expectations"
rating for failing to reach beyond her basic skills and to get
involved in other areas of the group.  The complainant refuted
this claim.  The complainant explained that she requested
additional training and that she consistently expressed a desire
to learn to enter equity trades and bond trades.  The
complainant said that she was advised to ask her co-workers to
teach her how to perform their functions.  She pointed out that
none of her younger non African American peers are trained in
this manner.  The complainant said that those individuals are
actively cross-trained and their desire to learn other tasks is
facilitated.

The complainant was placed on a Performance Improvement Plan on
June 21, 2005. The complainant disputed the accuracy of the
contents of the plan.  The complainant characterized the plan as
a "laundry list" of her alleged deficiencies.  The complainant
explained that many of the alleged mistakes noted in the plan
were allegedly brought to her attention before hand.  The
complainant contended that these items were brought to her
attention for the first time in the June 21, 2005 memo. The

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management, Llc

complainant also noted that the respondent did not provide this
type of memo to any of its other employees.

The complainant added that many of the numbers on which she
relies are provided to the company by outside sources such as JP
Morgan and Lehman.  The complainant said that the respondent
never took this fact into account or attempted to verify the
accuracy of the numbers from these outside sources before
blindly blaming her and threatening her with termination.

The complainant explained that she had been extra careful in
imputing the trades given the errors for which she was blamed.
However, she continued to be unreasonably attacked by the
respondent.  Furthermore, the complainant said that procedures
were changed without her ever being advised of the changes.

The complainant asserted that although she was an employee of
the company for 16 years, a performance improvement plan was
never sent to her before she filed her complaint with the
Division.  Approximately two and one half months after being
placed on a performance improvement plan, the complainant was
terminated.

Respondent's Position:

The respondent stated that in or around March 2004, the
respondent determined that it would be necessary for at least
one employee in the Trade Support Department to remain beyond
normal business hours each night of the workweek.  This was in
response to the growing complexity of futures trades handled by
the complainant. The original plan was that employees in the
department were each assigned an entire workweek during which
they were required to stay late on a rotating basis.   The
complainant informed her manager that it would be inconvenient
for her to stay late each night for a full workweek.   The
company accommodated the complainant's time constraints, and she
was assigned to work late only one night per workweek.   Other
employees had to cover the remaining four days per week on a
rotating basis.  The company soon received complaints from the
complainant's co-workers that she frequently declared herself
unable to stay late on her single assigned night of coverage.
This forced other employees to cover for her without any advance
notice.   In addition, there were occasions that the complainant
simply left before 5:00 p.m. on her assigned late night without
giving any notice that she was leaving.   In September 2004, Mr.
Potter decided to revert to the original late-night coverage
schedule in which each employee would be responsible for an
entire workweek of coverage.

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

The complainant refused to accept the weekly late-night schedule
claiming that she had other responsibilities in the evening.

On August 23, 2004, Anthony Gallagher, Director of Operations,
received an email indicating that options for orange juice had
been misbooked for the third time in a week.  Mr. Gallagher sent
an email to the complainant indicating that he had been
receiving complaints about misbookings.  The complainant denied
making any errors and sought to shift the blame to other staff
members in her department.  Mr. Gallagher investigated the
matter and determined that the complainant was, in fact,
responsible for the three misbookings.

The respondent added that in 2004, Mr. Gallagher and Mr. Potter
received internal complaints and complaints from clients
indicating that the complainant's work was inaccurate and that
she was unresponsive in correcting errors.

On October 6, 2004, a meeting was held with Mr. Gallagher, Mr.
Potter, and Lynne Gabriel, Director of Human Resources, to
discuss the deficiencies in the complainant's work product and
her refusal to work the same late-night schedule as her co-
workers.  The complainant agreed to work the rotating weeklong
schedule.

The respondent made the following statements about the
complainant's 2004 performance evaluation.

The respondent stated that written performance evaluations are
drafted for each analyst by his or her manager on an annual
basis, with input from Human Resources.  Analysts are reviewed
in a number of "Performance Factors," and are rated as being
"Above Expectations," "Meets Expectations," "Below
Expectations," or "Unsatisfactory."  The manager can provide
examples of relevant performance next to the rating for each
performance factor.  Each analyst is given an "Overall
Performance Summary" based on one of the four ratings.  Once the
draft evaluation is completed, the manager sends it to Human
Resources for review and finalization.  Once the evaluation is
finalized, the manager then meets with the analyst to review the
performance evaluation together.

The complainant's 2004 performance evaluation was drafted by Mr.
Potter.  Mr. Potter consulted with Ms. Gabriel and Mr. Gallagher
in order to identify those areas of the complainant's
performance which needed improvement.  Mr. Potter completed a

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management, Llc

first draft of the complainant's evaluation in November 2004 and
forwarded the draft to Human Resources at that time.

The evaluation underwent a few revisions prior to finalization.
The complainant was given an overall rating of "Meets
Expectations."   The complainant did receive a rating of "Below
Expectations" with respect to the following performance factors:
"Ability to Work Independently (Relative to Position)," "Ability
to Work as a Team," "Responsiveness," and "Professionalism."

On February 9, 2005, Mr. Potter met with the complainant to
review her 2004 performance evaluation.  Mr. Potter began the
meeting by passing along positive feedback he recently received
from an outside party regarding the complainant's performance to
her, and he expressed to her his hopes that the positive
feedback would continue.  Mr. Potter offered the complainant an
opportunity to raise any issues she had with the review, but she
declined to do so.  At the end of the review session, the
complainant signed one copy of the evaluation and kept her copy
of the evaluation.

On February 10, 2005, the complainant sent an email to Mr.
Potter requesting a copy of the evaluation.  Mr. Potter was not
in the office that day.  On February 11, 2005, Mr. Potter
provided the complainant with a copy of the evaluation.  Later
that day, the complainant contacted Human Resources to request
another copy of her evaluation.  Human Resources provided her
with a copy of the evaluation she had signed.  The complainant
reviewed that document, and she said that it was different from
the one she signed on February 9th.  The complainant did not
recall seeing any rating of "Below Expectations" on the
evaluation she had signed.  The complainant said that she would
not have signed the evaluation had she seen such a rating.  The
complainant claimed that someone had removed the signature page
from the evaluation she had signed and attached it to a more
critical evaluation.

On February 14, 2005, the complainant met with Ms. Gabriel and
again claimed that the review she received on February 11th was
not the same one she signed on February 9th.  Ms. Gabriel asked
the complainant if she was completely certain about her
allegations.  The complainant changed her story from there being
no "Below Expectations" ratings to that there may have been some
ratings of "Below Expectations."  Also, the complainant recalled
having only seen one "Below Expectations" rating on the
evaluation she reviewed on February 9th.

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management, Llc

On February 16, 2005, Ms. Gabriel met with Mr. Potter, Mr.
Gallagher, and Kevin Shannon, Chief Financial Officer, to
discuss the complainant's allegations pertaining to her 2004
evaluation.  Mr. Potter denied switching the complainant's
review, and he claimed that the evaluation the complainant
received from Human Resources was the same one he reviewed with
her on February 9th.  On February 17, 2005, Ms. Gabriel met with
the complainant, Mr. Potter, Mr. Gallagher, and Mr. Shannon to
discuss the matter.  In this meeting, the complainant again
admitted that there may have been some "Below Expectations"
ratings on the review she had signed, but it was still not the
review she received on February 11th.  The company stood by the
review the complainant received on February 11th.

On April 19, 2005, the complainant met with Ms. Gabriel to
discuss the status of her evaluation.  Ms. Gabriel told that
complainant that she could either sign the review that was
discussed with her on February 17, 2005 or she could refuse to
sign the evaluation.  The complainant again refused to sign the
evaluation.

The respondent stated that the complainant remains employed as a
Senior Analyst in the Trade Support Department.  On January 1,
2005, the complainant's salary was increased from $60,000 to
$61,800 per year.  No adverse employment actions have been taken
against the complainant on the basis of her 2004 performance
evaluation and no plans exist to replace her.

The respondent gave the following responses to the five examples
cited by the complainant in Particular #9 of her complainant on
how she believes she has been treated disparately.

In regard to Particular #9a, the respondent wrote that similar
performance issues reflected in the complainant's 2004
evaluation were documented in 1995.

In regard to Particular #9b, the respondent denied this
particular in its entirety.

In regard to Particular #9c, the respondent stated that since
1989, Mr. Potter has hired a total of 16 individuals for
positions in the New York and London offices.  Of the 16
individuals Mr. Potter hired, three were Asian, and two were
females.

In response to Particular #9d, the respondent stated that all
employees are provided with opportunities for development and
advancement.  Open positions are posted on the intranet site.

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management, Llc

Employees who wish to pursue open positions must first express
their interest to Human Resources.  Generally, the applicant
will be provided an opportunity to have an initial interview
with the hiring department in which the position is available.
The respondent added that the company offers its employees
opportunities to participate in both internal and external
training.  An employee who seeks professional training needs
only to inform Human Resources of his or her interest in such
opportunities.  Human Resources will then engage the employee in
an interactive process to determine the training opportunities
best suited to the employee's goals.

The respondent stated that the complainant never expressed
interest in any open position or professional training to Human
Resources.

The respondent pointed out that in her 1996 performance
evaluation it was noted that the complainant wanted to learn
more about Commercial Paper and Time Deposits.  Approval was
given for the complainant to receive this training.  When her
manager went to her to deliver this training, the complainant
said that she no longer wanted to do it.

In response to Particular #9e, the respondent stated that nine
employees were terminated over the course of the last six months
and all nine were Caucasian.  Two of the nine terminated
employees were under the age of 40.

The respondent gave the following responses to the amended
allegations of this complaint.

The respondent gave the following response to the claim that Mr.
Potter began sending the complainant various memos and
correspondences accusing her of alleged deficiencies in her
work.

As discussed herein, the Company's concerns relating to
Complainant's performance were addressed with her both prior to
and following the filing of her Initial Complaint. The Company
documented Complainant's performance issues in response to
external and internal complaints from portfolio managers,
execution traders and counterparties that Complainant's work was
replete with mistakes and that she was slow to correct any of
her mistakes. (See, e.g., emails attached to Moore's April
Position Statement at Tab G and herein at Tabs 5, 6 and 11.) The
Company not only addressed the issues with Complainant, it
provided a Plan to assist Complainant to improve her
performance. (See Plan attached hereto at Tab 13.)

10

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

The respondent gave the following response to the claim that Mr.
Potter only replied once to the responses the complainant wrote
to unreasonable and retaliatory memos and emails.

The Company denies the allegations contained in this sentence of
paragraph 11 of Complainant's Amended Complaint and, as
demonstrated herein, Mr. Potter and/or other Company personnel
consistently responded to Ms. Pierre's emails relating to her
performance issues. (See, e.g., emails attached hereto at Tabs
7, 11 and 15.)

The respondent gave the following response to the claim that Mr.
Potter only threatened termination and was unresponsive to the
complainant's concerns.

The Company denies the allegations contained in this sentence of
paragraph 11 of Complainant's Amended Complaint. The Company
responded to each of Complainant's emails concerning her
performance and informed her of the seriousness of her
performance issues. See supra. at pp. 3-6. Mr. Potter identified
the possibility of termination of Complainant's employment only
after placing Complainant on a Performance Improvement Plan due
to Complainant's failure to correct her own errors.

The respondent gave the following response to the claim that it
had no interest in addressing or rectifying any of her concerns,
nor that it had any interest in remedying any alleged
performance deficiencies it was claimed the complainant
exhibited.

The Company denies the allegations contained in this sentence of
paragraph 11 of Complainant's Amended Complaint. Throughout the
Complainant's employment, the Company was responsive to all
concerns raised by Complainant and sought to assist Complainant
in addressing and remedying her performance deficiencies.
Indeed, the Company spent significant time informing Complainant
of her deficiencies and instructing her as to how to remedy her
deficiencies. Even when presenting Complainant with a
Performance Improvement Plan, the Company explicitly instructed
Complainant that its intent was to assist her in improving.
Ultimately it was Complainant's refusal to accept responsibility
for her actions (and therefore correct her deficiencies) that
led to the termination of her employment.

The respondent gave the following response to the claim that
after she filed her complaint, their correspondence regarding

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

her alleged shortcomings began and the communications continued
and increased.

The Company denies the allegations contained in this portion of
paragraph 12 of Complainant's Amended Complaint. Contrary to
Complainant's allegations, identical performance issues were
identified in her 2004 performance review (which predated her
Initial Complaint), in early 2005, and were documented as early
as 1995. See Complainant's 2004 Performance Review, attached at
Tab A of Moore's April 2005 Position Statement; see also April
7, 1995 Memorandum, attached at Tab H of Moore's April 2005
Position Statement; May 16, 1995 Performance/Position Evaluation
Memorandum, attached at Tab I of Moore's April 2005 Position
Statement. In fact, on May 2, 1995, Complainant received a
formal written performance warning. See May 2, 1995 Performance
Warning, attached at Tab J of Moore's April 2005 Position
Statement.

The respondent gave the following response to the claim that she
was marginalized from her work group and made to sit at a
location away from her work group.

The Company denies the allegations contained in this portion of
paragraph 12 of Complainant's Amended Complaint. Complainant is
one of 15 analysts, all of whom sit together in two rows of
cubicle-like trading desks. As the most senior analyst,
Complainant had the first choice of desk when the group assumed
its current location. In late June 2005, a new analyst joined
the group. In an effort to ensure that the new analyst had
proper supervision, the Company sought to place him near a more
senior analyst working on the same type of trades. (See June 28,
2005 email from Martell to Potter, attached hereto at Tab 18.)
The addition of a new analyst required reconfiguration of the
seating of the analyst. The Company concluded that the most
logical move would be to move Complainant one desk (four feet)
to her left within the same trading desk row to a larger work
space. (See June 28, 2005 email from Potter to Berman attached
hereto at Tab 18.) Mr. Potter approved the move, believing it to
be a "win for everyone" because it would afford the new analyst
supervision and Complainant a larger work space. (Id.)

The respondent gave the following response to the claim that
Mr. Potter stopped directly communicating with her; Mr. Potter
began sabotaging her work and blaming her for errors; Mr. Potter
refused to address all of her concerns regarding respondent's
allegations of poor performance; the respondent refused to allow
her to prove that she was not the source of any errors.

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

The Company denies the allegations contained in this portion of paragraph 12 of Complainant's Amended Complaint.

The respondent gave the following response to the claim that on September 8, 2005, the complainant was summarily terminated without any opportunity to address her alleged deficiencies or to address false allegations made against her.

The Company denies the allegations contained in this sentence of paragraph 12 of Complainant's Amended Complaint. Contrary to these allegations, the Company consistently addressed its concerns about Complainant's performance each time they arose. Indisputably, Complainant had notice of the Company's concerns about her performance and the significant cost borne by the Company resulting from her errors since August 2004. (See. e.g.. emails attached to Moore's April Position Statement at Tab G and herein at Tabs 5, 6 and 11.)

Investigator's Observations:

Submitted by:  _David E. Powell_
David E. Powell
Human Rights Specialist I

## III. BASIS FOR DETERMINATION

The investigation revealed that the complainant began working for the respondent in September 1989 as a Data Analyst.  The complainant received satisfactory evaluations for her performance for each year she worked.  The only times she received any negative comments about her performance were in her 1995 and 2004 evaluations.

In 2005, the respondent allegedly found deficiencies in the complainant's performance.  Specifically, the respondent believed the complainant was responsible for "misbookings" on an orange juice account.  Also, the respondent felt that the complainant resisted having to work late every day for a full week on a rotating basis.

The complainant refuted the respondent's claim about her performance or her reluctance to work the late night schedule. The complainant explained that when the late night schedule was first announced, it caused a conflict with after work commitments she had.  The complainant re-arranged her after work

13

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

schedule, and complied with the respondent's requirement to work
late nights every evening for a week on a rotational basis.  The
complainant asserted that the real reason for being blamed for
performance deficiencies is that she is a 49 year old African
American female.  Also, the complainant asserts that she was
retaliated against after she filed the instant complaint.

The investigation revealed that the complainant was the only
African American Data Analyst in her group, and she was the
oldest one by far.  The investigation revealed that there was no
other data analyst in her age group.  All of the other Data
Analysts were either in their twenties or their thirties.  The
investigation revealed that since 1989, 16 individuals were
hired for positions in the New York and London offices.  Of
these 16 individuals, all were non-African American.

The respondent claimed that two females were hired during the
same time period; however, the respondent never identified who
these females are.  There is a conflict between the parties in
that the respondent listed a female Data Analyst other than the
complainant.  The complainant did not identify a female when she
named the Data Analysts who worked for the company during the
relevant time period.  The respondent only provided performance
evaluations for male Data Analysts when asked to submit said
records for other Data Analysts in the complainant's group.

The complainant claimed that she performed her duties as a Data
Analyst satisfactorily for 15 years until her last performance
review.  The respondent claimed that the complainant made errors
and "misbookings" on commodities; that performance deficiencies
were brought to her attention before hand; and that she had
received less than satisfactory ratings on her 1995 review.

The complainant refuted the respondent stated reasons for how
she was treated.  The complainant pointed out that the Data
Analysts had to rely on data provided to them by outside
sources; that the data provided by these sources contained
errors; and that the Data Analysts had no way of knowing when
the erroneous data was provided to them by these outside
sources.  The complainant further noted that a problem existed
in the company's investment master system which contributed to
booking errors in certain types of commodities, such as orange
juice.  The respondent was aware of this problem for three
months at the time the complainant was accused of the
"misbookings."

The investigation revealed that other Data Analysts made errors,
but no evidence was proffered by the respondent to demonstrate

14

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

that the errors made by these persons were treated in the same manner as were the errors allegedly made by the complainant. The respondent claimed that no other Data Analyst made the same amount of errors as the complaint; however, no evidence was provided by the respondent to support this claim.

The investigation revealed that despite the fact that other Data Analysts made errors; the complainant appeared to be treated more harshly than her younger, male, Caucasian counterparts. The complainant asserted that none of these Data Analysts received poor evaluations; none of them were placed on a Performance Improvement Plan as was she; and none of them were terminated.

Another conflict between the parties concerns the issue of terminated employees. The complainant asserts that she was the only Data Analyst terminated. The respondent contends that nine employees were terminated over a six month period, and they were Caucasian.

There is yet another conflict between the parties which could not be resolved during the investigation. The complainant claimed that the 2004 evaluation she signed and dated only contained one negative comment about her not going out after work with clients and coworkers for drinks or dinner. The complainant claimed that she did not receive a copy of this evaluation after she signed and dated it. When she eventually received a copy of the evaluation, there were additional areas in which she received negative ratings. The complainant contends that the evaluation was switched and altered after she signed it. The complainant noted that the copy she was given was undated and unsigned. The respondent admitted that the complainant signed and dated the evaluation in question, and that such a copy was given to her on the spot. It could not be determined at the investigation stage which is the true evaluation.

The investigation revealed a nexus between the date on which the initial complaint was filed and the date on which the complainant was terminated. The investigation revealed that the instant complaint was filed on April 27, 2005. On June 21, 2005, the complainant was placed on a Performance Improvement Plan. On September 8, 2006, the complainant was terminated.

The investigation revealed that despite admitting other Data Analysts made errors, a review of the 2004 evaluations for these individuals revealed that none of them received a rating of below expectations or unsatisfactory in a single category. The

Final Investigation Report and Basis of Determination
SDHR Case No. 10104768
Juliette Pierre v. Moore Capital Management,Llc

only such person to receive such ratings was the complainant.
The complainant is a 49 year old African American woman, and the
others were Caucasian males in their twenties or thirties.
It appears that the complainant offered evidence which refutes
the claims that her performance was lacking. The complainant
offered plausible explanations for errors or "misbookings" made
by the others and her.  It appears that the complainant was the
only Data Analyst held accountable for such errors.  There
appears to be a nexus between the filing of the instant
complaint and the complainant's termination from the company
after sixteen years of otherwise satisfactory performance.
Lastly, there are outstanding conflicts between the parties
which could not be resolved during the investigation that could
best be resolved at hearing.

Reviewed & Approved: _____
                     M. Leona James
                     Human Rights Specialist II

## IV.  DETERMINATION

Based on the foregoing, I find Probable Cause to support the
allegations of the complaint.

_____
Wilson Ortiz
Acting Regional Director

16

# EXHIBIT B

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

LAW OFFICES OF
FREDERICK K. BREWINGTON

DEC 2 1 2007

RECEIVED

---

NEW YORK STATE DIVISION
OF HUMAN RIGHTS
on the Complaint of

JULIETTE PIERRE,

Complainant,

v.

MOORE CAPITAL MANAGEMENT, LLC,

Respondent.

---

NOTICE AND
FINAL ORDER

Case No. 10104768

---

PLEASE TAKE NOTICE that the attached is a true copy of the Recommended Order

of Dismissal for Administrative Convenience ("Recommended Order"), issued on

November 23, 2007, by Lilliana Estrella-Castillo, an Administrative Law Judge of the New York

State Division of Human Rights ("Division"). An opportunity was given to all parties to object

to the Recommended Order, and all objections received have been reviewed.

PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED

ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE KUMIKI

GIBSON, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE

DIVISION OF HUMAN RIGHTS ("ORDER"). In accordance with the Division's Rules of

Practice, a copy of this Order has been filed in the offices maintained by the Division at One

Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any

member of the public during the regular office hours of the Division.

PLEASE TAKE FURTHER NOTICE that any party to this proceeding may appeal this

Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is

the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, within sixty (60) days after service of this Order. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. Please do not file the original Notice or Petition with the Division.

**ADOPTED, ISSUED, AND ORDERED,** this 17th day of December, 2007.

KUMIKI GIBSON
COMMISSIONER

TO:

Complainant
Juliette Pierre
104-41 203rd Street
Saint Albans, NY 11412

Complainant Attorney
Frederick K. Brewington, Esq.
Frederick K. Brewington Law Office
50 Clinton Street, Suite 501
Hempstead, NY 11550

Respondent Attorney
Morgan, Lewis & Bockius, LLP
Attn: Ken Turnbull, Esq.
101 Park Avenue
New York, NY 10178-0060

Hon. Andrew Cuomo, Attorney General
Attn: Civil Rights Bureau
120 Broadway
New York, New York 10271

State Division of Human Rights
Enforcement Unit
One Fordham Plaza, 4th Floor
Bronx, New York 10458

Lilliana Estrella-Castillo
Administrative Law Judge

Sara Toll East
Chief, Litigation and Appeals

Caroline J. Downey
General Counsel

Peter G. Buchenholz
Adjudication Counsel

Matthew Menes
Adjudication Counsel

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

LAW OFFICES OF
FREDERICK K. BREWINGTON

DEC 2 1 2007

RECEIVED

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS
   on the Complaint of

JULIETTE PIERRE,
                        Complainant,
            v.

MOORE CAPITAL MANAGEMENT,LLC,
                       Respondent.

---

RECOMMENDED ORDER
OF DISMISSAL FOR
ADMINISTRATIVE
CONVENIENCE

Case No. 10104768

## PROCEEDINGS IN THE CASE

On March 28, 2005, Complainant filed a verified complaint with the New York State

Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory

practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division found that it had jurisdiction over the complaint and that

probable cause existed to believe that Respondent had engaged in unlawful discriminatory

practices. The Division thereupon referred the case to public hearing.

The case was assigned to Lilliana Estrella-Castillo, an Administrative Law Judge ("ALJ")

of the Division. Complainant was represented by by the Law Offices of Frederick K.

Brewington, by Gregory Calliste, Jr. Respondent was represented by Morgan, Lewis & Bockius,

LLP., by Kenneth Turnbull.

On November 20, 2007, Complainant made a request for an administrative dismissal of

the complaint because she "intends to vindicate her rights in Federal Court." Respondent did not

object to the dismissal.

Pursuant to Section 297.3(c) of the Human Rights Law, the complaint should be dismissed on the grounds of administrative convenience. The Complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved.

ORDERED, that the case be dismissed for administrative convenience.

DATED:  November 23, 2007
        Bronx, New York

Lilliana Estrella-Castillo
Administrative Law Judge

# EXHIBIT C

EEOC Form 161 (3/98)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To:  Juliette Pierre<br>104-41 203rd Street<br>Saint Albans, NY 11412 | From:  New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

LAW OFFICES OF FREDERICK K. BREWINGTON

FEB 1 1 2008

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|
| EEOC Charge No. | EEOC Representative | Telephone No. |
| 16G-2005-02543 | Holly M. Woodyard,<br>Investigator | (212) 336-3643 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ]  While reasonable efforts were made to locate you, we were not able to do so.

[ ]  You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X]  Other (briefly state)      **Charging Party wishes to pursue matter in Federal District Court.**

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____
Spencer H. Lewis, Jr.,
Director

FEB 06 2008

_____
(Date Mailed)

Enclosures(s)

| cc:  MOORE CAPITAL MANAGEMENT, LLC<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Attn: Director of Human Resources | Gregory Calliste, Jr.<br>Law Offices of<br>Frederick K. Brewington<br>50 Clinton Street, Suite 501<br>Hempstead, NY 11550-4282 |
|---|---|

DOCKET NO.:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

JULIETTE PIERRE,

Plaintiff,

-against-

MOORE CAPITAL MANAGEMENT, LLC,
ANTHONY GALLAGHER, in his official and
individual capacities, JOHN POTTER, in his
official and individual, LYNNE GABRIEL, in her
official and individual capacities, EMPLOYEES
JOHN and JANE DOES 1-3, in their official and
individual capacities,

Defendants.

-------------------------------------------------X

SUMMONS AND COMPLAINT

-------------------------------------------------X

LAW OFFICES OF
FREDERICK K. BREWINGTON
Attorneys for Plaintiff
50 Clinton Street, Suite 501
Hempstead, New York 11550
(516) 489-6959